1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

SON TRUONG VO,

CASE NO. 2:26-cv-00135-JNW

8

            Petitioner,

ORDER GRANTING PETITION FOR
WRIT OF HABEAS CORPUS

9

    v.

10
11

BRUCE SCOTT, Warden, Northwest
ICE Processing Center,

12

        Respondents.

13

## 1. INTRODUCTION

14
15

In December 2025, Immigration and Customs Enforcement ("ICE") revoked

16

Petitioner Son Truong Vo's order of supervised release ("OSUP") without warning at

17

a scheduled check-in and detained him. In response, Vo filed this petition for writ of

18

habeas corpus. The Court GRANTS the petition IN PART for the reasons below and

19

ORDERS Vo's immediate release.

20

## 2. BACKGROUND

21

Vo is a 52-year-old man, born in Vietnam, who came to the United States

22

with his parents and siblings as a refugee in 1994. In 1997, he was convicted of

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

assault and served a prison sentence of 93 months. After his release, in 2003, he was detained by the Department of Homeland Security and ordered removed by an Immigration Judge. The Government was unable to remove him to Vietnam. After detaining Vo for four months and 28 days, the Government released him on an Order of Supervision ("OSUP"). He has complied with that OSUP for 23 years and built his life and family in the United States. His wife is a U.S. citizen, as are his three children, ages 19, 18, and 12. The family's home is in Umatilla, Oregon, and they own a nail salon in Hermiston, Oregon.

In June 2025, Vo appeared for his annual ICE check-in, during which an ICE officer placed him on the Intensive Supervision Appearance Program ("ISAP")—which requires participants to check in periodically through an app on their phones. Dkt. No. 1 ¶ 20. On December 15, 2025, the ISAP app instructed Vo to appear in person the next day. When he appeared, an ICE officer told him that he would take him to a private room to schedule his ICE check-in for the following year. When they arrived in the private room, the officer told Vo that he was actually revoking Vo's OSUP and detaining him. *Id.* ¶ 21. The Government submitted a signed Notice of Revocation of Release dated December 16, 2025, providing only the following, vague reason for re-detention: "A determination was made that there is now significant likelihood of your removal from the U.S. in the foreseeable future." Dkt. No. 12-7 at 2. Vo asserts that he does not remember ever seeing or signing this document. Dkt. No. 1 ¶ 22.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### 3.   DISCUSSION

**3.1    Legal standards.**

#### 3.1.1    Habeas relief.

Federal courts have authority to grant writs of habeas corpus to any person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus "entitles [a] prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody," and thus to warrant relief, a petitioner must demonstrate that his detention is unlawful. *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see Lambert v. Blodgett*, 393 F.3d 943, 969 n.16 (9th Cir. 2004) ("In state collateral litigation, as well as federal habeas proceedings, it is the petitioner who bears the burden of proving his case."); *see also Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) ("petitioner carries the burden of proving by a preponderance of the evidence that he is entitled to habeas relief" when challenging incarceration by the state under 28 U.S.C. § 2254). A district court's habeas jurisdiction extends to challenges to immigration-related detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Demore v. Kim*, 538 U.S. 510, 517 (2003).

#### 3.1.2    Other equitable relief.

Federal courts have "long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional

violation." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). "Where habeas petitioners raise Due Process claims and have also invoked the Court's jurisdiction under 28 U.S.C. § 1331, the Court has 'the authority both to entertain [the petitioner's] constitutional challenges and to grant injunctive relief in response to them,' 'irrespective of the accompanying habeas petition.'" *See Francisco Lorenzo v. Bondi*, Case No. 2:25-cv-02660-LK, 2026 WL 237501, at *6 (W.D. Wash. Jan. 29, 2026) (quoting *Roman*, 977 F.3d at 941–42). "Once a [constitutional] right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Roman*, 977 F.3d at 942 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). And "[i]n time-sensitive circumstances, the district court's authority to issue broad equitable relief encompasse[s] the authority to grant provisional relief 'to bring an ongoing violation to an immediate halt.'" *Id.* (quoting *Hutto v. Finney*, 437 U.S. 678, 687 n.9, (1978)).

It is well established that plaintiffs seeking equitable relief in the form of permanent injunctions must show: "(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006); *see Francisco Lorenzo*, 2026 WL 237501, at *6 (applying permanent injunction standard to injunctive relief requested in immigration habeas proceedings).

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS - 4

1

**3.2    Continued detention violates Vo's due process rights.**

2

Vo argues that his continued detention violates due process because there is

3

no significant likelihood he will be removed in the reasonably foreseeable future.

4

The Court agrees.

5

In *Zadvydas*, the Supreme Court held that 8 U.S.C. § 1231(a)(6) "does not

6

permit indefinite detention." 533 U.S. at 689. Rather, it allows detention only for "a

7

period *reasonably necessary* to bring about that [noncitizen]'s removal from the

8

United States." *Id*. "[O]nce removal is no longer reasonably foreseeable, continued

9

detention is no longer authorized by statute." *Id*. at 699.

10

The Court established six months as the "presumptively reasonable" period of

11

post-removal-order detention. *Id*. at 701. After six months, "once the [noncitizen]

12

provides good reason to believe that there is no significant likelihood of removal in

13

the reasonably foreseeable future, the Government must respond with evidence

14

sufficient to rebut that showing." *Id*. "[A]s the period of prior postremoval

15

confinement grows, what counts as the 'reasonably foreseeable future' conversely

16

would have to shrink." *Id*. The Government's burden to justify continued detention

17

thus becomes increasingly demanding over time.

18

Vo is detained under 8 U.S.C. § 1231(a)(6), which authorizes continued

19

detention after the 90-day removal period for certain categories of noncitizens or

20

release under conditions of supervision. *See Zadvydas*, 533 U.S. at 682. It is

21

undisputed that the Government has detained Vo for more than six months, in

22

total. Dkt. No. 10 at 11.

23

1    The Government argues that the six-month period established in *Zadvydas*

2    "reflects the *earliest* point" at which a noncitizen's detention could raise

3    constitutional issues, suggesting that because the six-month period has only

4    recently passed, detention remains lawful. Dkt. No. 10 at 11–12. The Court

5    disagrees. The six-month period creates a presumption of reasonableness, not

6    automatic immunity from review. Indeed, the *Zadvydas* framework requires courts

7    to assess not only how long the petitioner has been detained, but whether removal

8    is significantly likely to occur in the reasonably foreseeable future. 533 U.S. at 701.

9    Here, the record demonstrates it is not.

10    Vo has shown there is no good reason to believe that his removal is likely to

11    occur in the reasonably foreseeable future. The Government has been unable to

12    remove Vo to Vietnam for 23 years. And the Government's return indicates that it is

13    still "working to complete the necessary travel documents request to Vietnam." Dkt.

14    No. 10 at 2. The Government does not explain why it believes Vietnam will accept

15    Vo, in particular—it does not provide Vietnam's criteria for issuing travel

16    documents, much less explain whether Vo meets them. And while the Government

17    states that travel documents from Vietnam "can be issued in approximately 30

18    days," it notably omits any reason to believe that *Vo's* travel documents (if issued)

19    will be issued in 30 days. Nor does it explain how long Vietnam *typically* takes to

20    issue travel documents.

21    Vo submitted the declaration of immigration attorney Tin Thanh Nguyen,

22    dated October 9, 2025, to support his petition. Dkt. No. 5-6. In 2025, Tin worked

23    with or assisted on the cases of nearly 100 pre-1995 entrants for whom ICE

1    requested travel documents. *Id*. ¶ 7. As of the date of his declaration, he had not

2    seen Vietnam issue a travel document within thirty days. "Rather, in [his]

3    experience, it can take many months to get any answer from Vietnam about

4    whether it will issue a travel document." *Id*. The process usually takes months

5    because it involves two separate Vietnamese agencies and local Vietnamese police,

6    who "conduct interviews and site-visits with the [individual's] relatives in Vietnam."

7    *Id*. ¶ 8. Nguyen also clarifies that the process can take even longer for Vietnamese

8    nationals who entered the United States before 1995 because they often "no longer

9    have any relatives in Vietnam who can verify their identity, or they do not have any

10   documentation from Vietnam at all." *Id*. ¶ 9.

11         The declaration of Jacqueline Dan, in-house immigration specialist at the

12   Orange County Public Defender's Office, confirms that the Government moves

13   slowly when attempting to remove Vietnamese nationals to Vietnam. Dkt. No. 9.

14   Dan has tracked ICE's detention of Vietnamese nationals across the country and

15   has "never heard of the U.S. government requesting travel documents for

16   Vietnamese nationals prior to their detention, even when they have been released

17   on an order of supervision and have been checking in regularly with an ICE officer."

18   *Id*. ¶ 10. She also confirms that obtaining travel documents from Vietnam for pre-

19   1995 entrants "remains very challenging" and that "it takes far longer" than 30

20   days. *Id*. ¶ 11. The Government faces challenges in part due to Vietnam's

21   administrative process and in part due to the lack of identifying records the

22   Vietnamese Government has for certain individuals—particularly refugees who left

23   Vietnam before 1995. *Id*. ¶ 12 ("This investigation is often complicated by vital

1
2
3
4
5

records such as birth certificates that were never issued due to the birth occurring during periods of instability in the Vietnam War, or vital records that were destroyed during the War. In order to avoid persecution, people with ties to South Vietnam also often destroyed their own vital records after South Vietnam lost the civil war to North Vietnam.").

6
7
8
9
10
11
12
13
14
15
16

Vo also relies on a declaration from an employee of the Federal Public Defender in the Western District of Washington. Dkt. No. 6. This employee states that she has interviewed or spoken with the family members of 25 pre-1995 Vietnamese detainees held at the Northwest ICE Processing Center. She asserts that of these 25 people, only one has received travel documents from Vietnam, while two have been deported to third countries. *Id.* ¶ 3. She also notes the "disturbing trend," of the Government failing to request travel documents for these individuals until they file habeas cases, "creat[ing] the impression that ICE's main purpose in re-detaining these individuals is their incarceration, not their deportation." *Id.* ¶ 4. Given all this, Vo has made a strong showing that he is not likely to be removed in the reasonably foreseeable future.

17
18
19
20
21
22
23

The Government has not rebutted that showing. While it states that it removed 327 pre-1995 entrants to Vietnam in Fiscal Year 2025, it does not state how long those individuals were detained before their deportation. Moreover, even if Vietnam were generally amenable to issuing travel documents for pre-1995 entrants, that fact alone would not mean that Vietnam is likely to accept Vo in the near future. *Cf. Hoac v. Becerra*, No. 2:25-cv-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025). At most, the Government has shown that "there is at

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS - 8

least some possibility" that Vietnam might accept Vo "at some point." *Abubaka v. Bondi*, No. 25-cv-1889-RSL, 2025 WL 3204369, at *5 (W.D. Wash. Nov. 17, 2025) (quoting *Nguyen v. Scott*, 796 F. Supp. 3d 703, 725 (W.D. Wash. 2025)). As other courts in this district have found, "[t]hat is not the same as a significant likelihood that [the petitioner] will be accepted in the reasonably foreseeable future." *Id.* (quoting *Nguyen*, 796 F. Supp. 3d at 725); *see also Singh v. Gonzales*, 448 F. Supp. 2d 1214, 1220 (W.D. Wash. 2006) (Government failed to meet *Zadvydas* standard on rebuttal because it provided "no substantive indication regarding how or when it expect[ed] to obtain the necessary travel documents" to remove the petitioner).

The Government also asserts that, since February 2025, "ICE has not received any denials for the issuance of a travel document from the government of Vietnam." Dkt. No. 11 ¶ 11. This statement is misleading. Vietnam does not communicate to the U.S. Government that it is denying the issuance of a travel document, creating the appearance that the request is still pending when it is not. Dkt. No. 9 ¶ 11. Accordingly, the Government fails to rebut Vo's showing that his removal is not significantly likely to occur in the reasonably foreseeable future.

Thus, Vo's continued detention is no longer authorized by statute and violates due process. He must be released.

### 3.3   The Government violated Vo's due process rights when it revoked his OSUP and re-detained him without pre-deprivation process.

Before revoking supervised release and re-detaining a noncitizen, the Government must satisfy procedural due process. Under *Mathews v. Eldridge*, 424 U.S. 319, 334–5 (1976), courts weigh the private interest at stake, the risk of

erroneous deprivation through existing procedures, and the Government's interest to determine what process is constitutionally required. This Court has applied that test and finds that due process requires pre-deprivation notice and a hearing before revoking a non-citizen's order of supervision and re-detaining them. *See Ledesma Gonzalez*, Case No. 2:25-cv-01404-JNW-GJL, 2025 WL 2841574, at *7 (W.D. Wash. Oct. 7, 2025).

Indeed, courts in this district and elsewhere have repeatedly found that the Government must provide due process to noncitizens before revoking supervised release and re-detaining them, and that due process requires adequate notice and a pre-deprivation hearing; this case presents nothing that would warrant a different result. *See, e.g.*, *Aslan v. Wamsley et al.*, Case No. 2:25-cv-02698-JNW, 2026 WL 238675, at *3 (citing *E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025) (applying *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976))); *Tessema v. Bondi,* No. C25-2330-JNW-MLP, 2025 WL 4033288, at *1 (W.D. Wash. Dec. 11, 2025), report and recommendation adopted, No. C25-2330-JNW-MLP, 2026 WL 84922 (W.D. Wash. Jan. 12, 2026); *Pineda v. Chestnut*, No. 1:25-cv-01970-DC-JDP (HC), 2026 WL 25510, at *5 (E.D. Cal. Jan. 5, 2026) ("Although Respondents allege in their opposition that Petitioner repeatedly violated the terms of her release [citation omitted], no neutral arbiter has determined whether those facts show that Petitioner is a flight risk or danger to the community."); *Tesara v. Wamsley*, Case No. C25-1723-KKE-TLF, 2025 WL 3288295, at *1, *6 (W.D. Wash. Nov. 25, 2025) (even when it alleges supervised release violations, the Government must provide notice and a pre-detention hearing to comply with due process); *Ledesma Gonzalez*,

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS - 10

1    2025 WL 2841574, at *8–9. Additionally, the Court agrees that a "post-deprivation

2    hearing[ ] cannot serve as an adequate procedural safeguard because [it occurs]

3    after the fact and [thus] cannot prevent an erroneous deprivation of liberty." *Id*. at 8

4    (quoting *E.A. T.-B.*, 795 F. Supp. 3d at 1324). The Court finds no reason to

5    distinguish this case from similar cases, in which ICE revoked orders of supervision

6    without providing pre-deprivation notice or an opportunity to be heard.

7        The Government produced a signed Notice of Revocation of Release dated

8    December 16, 2025—the date of Vo's detention—arguing that this was enough

9    process. Dkt. No. 12-7. Vo disputes ever seeing or signing this document. Dkt. No. 1

10   ¶ 22. But the Court need not resolve that factual dispute. Even taking the

11   Government at its word, the Notice was handed to Vo as he was being detained.

12   That is not advance notice. The Notice is also substantively inadequate, as it states

13   only that "a determination was made that there is now significant likelihood of your

14   removal from the U.S. in the foreseeable future." Dkt. No. 12-7 at 2. This boilerplate

15   language gives Vo no information about the factual basis for revoking his OSUP and

16   no basis to prepare a meaningful response.

17       The Government does not dispute that no pre-deprivation notice or hearing

18   occurred. Instead, the Government attempts to distinguish Vo's case by arguing

19   that Vo is subject to a final order of removal. But the Government does not explain

20   why a final removal order diminishes the procedural protections owed before

21   revoking supervised release. Vo's OSUP was revoked, and district courts have

22   consistently held that before revoking an OSUP (or similar release order), the

23

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS - 11

Government must provide pre-deprivation notice and a hearing. Neither occurred here.

Accordingly, the Government violated Vo's procedural due process rights.

**3.4    The Court denies Vo's request to mandate that the Government reopen his immigration proceedings before removing him.**

Vo asks the Court to enjoin the Government from pursuing his removal "unless it first moves to reopen [Vo's] removal proceedings[.]" Dkt. No. 13 at 10. The Court recognizes that Vo has spent decades building a life the Government made no effort to disrupt—a U.S. citizen wife, three citizen children, and a small business. He contends he has viable claims for immigration relief, but the ordinary timeline to seek reopening has long since passed.

Vo mainly relies on *Chhoeun v. Marin*, 442 F. Supp. 3d 1233 (C.D. Cal. 2020), in which the court required written notice before the Government re-detained Cambodian nationals living under long-dormant removal orders. The factual parallels are striking, but the *Chhoeun* remedy was notice. The Court did not require the Government to affirmatively participate in reopening proceedings, and neither Vo nor the Court is aware of any case that has.

This request is also, in substance, a request for permanent injunctive relief. But because Vo does not address the applicable legal standard, the Court denies the request without prejudice. *See Francisco Lorenzo*, 2026 WL 237501, at *6.

**3.5    Vo's remaining requests for relief.**

The Court denies Vo's remaining requests for relief as follows.

First, Vo asserts the doctrines of laches and estoppel. In the Ninth Circuit, "estoppel traditionally is available against a nongovernmental party who has made a knowing false representation or concealment of material facts to a party ignorant of the facts, with the intention that the other party should rely on it, where the other party actually and detrimentally relies on it." *Mukherjee v. I.N.S.*, 793 F.2d 1006, 1008 (9th Cir. 1986). "[W]here justice and fair play require it," courts in the Ninth Circuit will apply estoppel against the Government. *Watkins v. United States Army*, 875 F.2d 699, 706 (9th Cir. 1989) (citation modified). "It is well settled, however, that the government may not be estopped on the same terms as a private litigant." *Id*. A party asserting estoppel against the Government must establish two additional elements. *Id*. First, "a party seeking to raise estoppel against the government must establish affirmative misconduct going beyond mere negligence." *Id*. at 707 (citation modified). "[E]ven then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Id*. (citation modified).

Vo does not argue that the Government made a false representation or concealed material facts when it delayed enforcing his removal order. Rather, as explained above, it did not enforce his removal order because it could not obtain travel documents to Vietnam. Accordingly, the doctrine of equitable estoppel does not apply to these facts.

Turning to laches. "The traditional rule is that the doctrine of laches is not available against the government." *Perez v. Holder*, 411 F. App'x 34, 35 (9th Cir. 2010) (quoting *United States v. Ruby Co.*, 588 F.2d 697, 705 n.10 (9th Cir.1978)).

The Ninth Circuit has acknowledged that even if laches could apply against the Government in some cases, it would be "subject to at least the same strictures as estoppel." *Id.* (quoting *Ruby Co.*, 58 F.2d at 705 n.10). Accordingly, laches does not apply either.

Finally, in his traverse, Vo moves for sanctions against the Government. Because the request was raised for the first time in reply, the Government did not have an opportunity to respond. Additionally, the motion for sanctions is confusingly intertwined with arguments on Vo's affirmative claims. *See* Dkt. No. 13 at 8–12). Accordingly, if Vo would like to seek sanctions against the Government, the Court will consider a separately filed motion for sanctions.

Given the Court's findings, it need not address Vo's claims under the Administrative Procedure Act.

Finally, Vo has agreed to hold all claims regarding third-country removal in abeyance. The Court does not address them.

### 4. CONCLUSION

Accordingly, the Court ORDERS:

1. The Petition for Writ of Habeas Corpus is GRANTED IN PART.

2. Respondents must RELEASE Petitioner from custody within TWENTY-FOUR (24) hours of this order, subject to the conditions of his prior OSUP.

3. Petitioner may not be re-detained unless (a) Respondents provide Petitioner with written notice of the basis for the proposed re-detention in

advance; and (b) an immigration court hearing is held to determine whether detention is appropriate.

4.  Within FORTY-EIGHT (48) hours of this order, Respondents must provide the Court with a declaration confirming that Petitioner has been released from custody and informing the Court of the date and time of his release.

5.  Any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412. *See Daley v. Ceja*, 158 F.4th 1152, 1162 (10th Cir. 2025) (the Equal Access to Justice Act authorizes the award of attorney's fees to petitioners who prevail against the government in immigration habeas actions).

6.  If Petitioner opts to move for sanctions, he must file and note the motion by February 27, 2026.

7.  All other relief requested is DENIED without prejudice, as stated in this Order.


Dated this 17th day of February, 2026, at 10:30 a.m.

Jamal N. Whitehead
United States District Judge